You may proceed. Thank you, Counsel. Good morning, Your Honors. Morning. I'm Scott Cameron, representing Mr. Steel Davis, the appellant, and I'd like to reserve two minutes for rebuttal. I think an important use of your time is to talk about whether or not what I contend are other acts were inextricably intertwined with the fraudulent scheme alleged, and I think the reason why I want to spend some time on that is it permeates all but one of the issues that are presented. This Court has held that to be inextricably intertwined, it either has to be part of a single criminal transaction, like selling cocaine and tobacco, or it's necessary for a coherent and comprehensible presentation of the evidence. These other acts kind of come in two categories. I actually like the way the government separated them in their briefing, and that was you have a set of acts attributable to my client where he makes a recruit more likely to be accepted into the guard. Aren't all of these acts sort of provides context for the overall scheme? No, not at all, because the scheme, the context for the scheme is that there's a GRAP program, Guard Recruiting Assistant program, and that there's a war, there's a conflict, and we need soldiers so much that we're willing to pay recruiting assistants. The fact that my client, who the record reflects is a car salesman when he's not a soldier, the fact that he's polishing the hubcaps quite a bit and saying don't mention the surgery, don't mention your child, that's his character. That's who he is, and that's the trial he got was a character trial. In fact, in the government's closing argument during the trial, they called these witnesses, the nominees that came in and testified with these vignettes, they called them unrelated, objective, potential soldiers. That was the closing argument. They are unrelated. That was accurate. The other category of witnesses is more complex. That's where the point I want to make with that first category, making people more enlistable, is that if there had been no GRAP program, then there would have been no fraud. Those events of my client making them enlistable certainly could have continued. To me, I'm not sure that that category falls under the inextricably intertwined. However, it seems to me that it falls under the exception that it was admissible to show purpose, plan, preparation, motivation, intent. He had two routes toward making an application more likely to be accepted as a recruit. One of them, he just did it to bolster his recruiting numbers. The other one, he was helping other people so that they can split an incentive award. Well, I think I heard two different concepts. I'm saying there's two, yeah. One is he could have been doing it for one or the other, meaning they're not inextricably intertwined. You can extricate one of them in that it's because he's trying to make recruits more recruitable, more the exception, the 404B2 category. Is that what I heard? Even if they weren't inextricably related to the GRAP scheme, that they came in on another basis. Here's a very critical point that I need to communicate to the court, is that we can't go back and now say they could have been for a limited purpose because the government came into the motions in limine and said, we're not presenting 404B evidence. That 404B evidence requires notice that you're going to use it. She provided notice that they weren't going to use it, and then it wasn't used for a limited purpose. The jury was allowed to consider it. So we can't now go back and say, well, it could have been for a limited purpose. It wasn't. So we can't go back and justify it. Because you would have asked for a limiting instruction. It would have been required on the spot. After they gave that testimony, the judge would have had to interrupt and say, you're about to hear evidence that my client told somebody not to disclose. So that evidence in your mind only comes in if it comes in under inextricably intertwined. And it does not. I mean, I think that the only wedge the government has is inextricably intertwined. And that doesn't work because it's not inextricably intertwined. You can argue it's intertwined, but the word inextricable can't extricate. It doesn't fly. Was it a harmless error? And is it harmless beyond a reasonable doubt? This is evidentiary. Because I'm on plain error. I'm on plain error review. So I have a hurdle. But the hurdle is met. And here's why. The other evidence comes from the three convicted felons who testified against him for a benefit. The government complains, well, Davis, that's only because Davis insisted on cash only. That's only because Davis insisted on no electronics, no text messages, no e-mails. But those assertions come from the cooperators themselves. It's the cooperators who say Davis is the one who created no evidence. I did want to hit an important part with a second category that's much more There was recruiter Lowry who testified that he had an arrangement with Jason Hare, a recruiting assistant, separate from this fraud scheme. And that my client opined to him, allegedly said, you should have made Hare split the money with you. That is an other act. It had nothing to do with, they called it a conspiracy during the closing argument the government did. The counts charged and even the uncharged counts were part of a fraud scheme with Jason Hare, Sarah Natras, Brian Capps, and allegedly my client. But this other thing was definitely an other act. And what the government should have done is said, look, we're going to offer that incident under 404B2 to prove that he knew about a fraud scheme, to show knowledge. But they didn't. They didn't do it that way. And what's particularly perplexing, or not perplexing, but disturbing, is that this is the government's answering brief, not from the trial, from their answering brief. When Davis learned that fellow recruiter Lowry had given Hare the personal identifying information of a potential soldier to be claimed in GRAP, the fact that Davis' response was to say that Lowry should get a cut of the fraudulent proceeds tends to make it more probable that Davis considered it appropriate to engage in GRAP fraud. That is absolutely pristine example of character evidence. They're saying in their answering brief that the relevance of that evidence was that it made it more likely that he acted in conformity with the behavior that he exhibited with Lowry. And the reason why plain error review requires reversal here is because it does reduce the confidence in the justice system when a person repeatedly volunteers himself in combat for his country, and then his I want to come back to whether or not that was pure character when he says you should split it. Can't we regard that as a consistent pattern? Well, common plan or scheme type of thing? 404B2 again. You're trying to limit it. You're trying to go back. You can't. That ship sailed. Well, but on plain error review, I'm not sure that that ship's entirely... Well, 404B2 argument, trying to go back, that ship sailed. I acknowledge that the plain error review is a hurdle, but I ask this Court to consider what Olano talked about is when is it appropriate? Okay, we have error. It's plain. What does it take? It takes showing that it's going to reduce the confidence in the reputation of the judicial process. It's very disturbing that the most credible evidence that came in from people who did not have a horse in the race was all character evidence. The less credible evidence, the more troubling the ones where people are admitting that they're testifying to get a reduced sentence that's hanging over their head right there. That's the evidence that was the direct evidence of the scheme charged, and it does reduce the confidence. It wasn't just one, two, or three witnesses. There was a parade of these witnesses that came through, and that's why I think the plain error standard is met here. But the question you're raising or the issue you're presenting is only with respect to Mr. Lowery, and his testimony was just only a few lines long in the transcript, and there was a pretty fulsome record of other evidence that painted a pretty dire picture here. It did create a dire picture of his character. In my brief, I list them out. There must be seven or eight instances where... I'm not suggesting the evidence painted a dire picture of his character. I'm just suggesting that the evidence presented a rather strong picture of his guilt. The only evidence of his involvement in the fraudulent scheme came from the cooperators, who I believe the defense counsel did a good job of putting their motives in question. The parade of horribles that came through from the independent witnesses, you know, don't talk about the surgery, don't talk about your child, those do paint a picture. That's the prejudice I'm talking about. That's why the prong in Olano that says, I have to show that it could have changed the outcome of the trial, I think is actually presented through the sentiment that you're reflecting, is that, geez, it looked pretty grim. But what really made it look grim was these very credible witnesses who were doing what they were told, answering these questions about my client's character. I would like to reserve the rest of my time for questions. Thank you, counsel. Good morning, Your Honors. May it please the Court. I'd like to start with the inextricably intertwined argument where the Court spent most of its time with defense counsel. And I'll start with the first point, the statements that Defendant Davis made to the soldiers for whom his co-conspirators illegally claimed them in GIRAP and for which he received money. These soldiers were not unrelated to the scheme. These soldiers were the mechanism of the scheme, and the statements he made to them to get them to sign up for the Guard, sign enlistment contracts, and ship to boot camp, were Steele Davis playing his part in the scheme. So to take a step back, the scheme was that Steele Davis would get people who walked in off the street interested in the Guard to sign up for the Guard. When they signed an enlistment contract, Docupack would send $1,000 to one of his co-conspirators whose Steele Davis had passed that nominee's personal identifying information because the co-conspirators had claimed in GIRAP falsely that they were responsible for referring that person to the Guard. Docupack, when they signed that contract, sent the co-conspirators $1,000, and Steele Davis got his $500 cut. So these witnesses who are encouraged to lie or to conceal various facts are the enlistees for whom the money is paid to the wrong people. Exactly. Steele Davis didn't get paid if they didn't sign those contracts. So Steele Davis did what it took to get them to sign up for the Guard. That evidence was evidence the government was entitled to present as part of its direct evidence of the scheme. The defense might have a point if these were unrelated recruits 10 years earlier who had never been GIRAP'd, 5 years earlier who had never been GIRAP'd, who Steele Davis had tried to get to sign up for the Guard to meet quotas. That's not this case. So moving on to the second point or the second category of evidence, the statements that the defendant made to nominee potential soldier Gregory and fellow recruiter Lowry about GIRAP. Those were party admissions at the heart of the scheme, and they aren't character evidence tending to prove that he's a fraudster. They're admissions that prove that he participated in the scheme, which is an element that the government needed to prove for this wire fraud trial. So the defense in this case was I didn't do it. Davis claimed that he was an upstanding recruiter, that, yes, his co-conspirators had participated in GIRAP fraud, but it was with someone else. He didn't know anything about it. So when he told Brian Gregory, one of the nominees charged in the indictment, when he told Brian Gregory, I'll slip you one next time, trying to get Gregory to sign up to be a co-conspirator for him, basically, to play the same role that Natras and Capps and Hare had played, that shows that he participated in GIRAP fraud. And it's the same inference, the same permissible inference, with his statement to recruiter Lowry. Recruiter Lowry worked out of the same armory as Steele Davis at one time. They held the same position. And one of Davis's co-conspirators in the case, Jason Hare, brought Lowry a recruit, a legitimate GIRAP, someone that Hare had actually brought into the guard, and that person didn't work out. So Hare didn't get paid. And the next time that someone came in off the street for Lowry and Lowry signed that person up to be in the guard, he said, I'll do a nice thing and give Jason Hare this person's information so that he could claim him in GIRAP. And when he told, recruiter Lowry told Steele Davis that, Steele Davis didn't say, That's fraud. What are you doing? Which would have been consistent with his defense. Instead, he said, Did you get a cut? Did you get a share of the money? And that tends to show that Steele Davis had the intent to commit this crime and that he participated in GIRAP fraud, that he participated in the scheme. So this is an entirely permissible evidence within the scope of the fraud. We talked a little about plain error review. This was not a credibility contest. The evidence against Davis was overwhelming. It wasn't just the three co-conspirators. It was all of the nominees who testified that they gave their personal identifying information to one person and one person only, and that was Steele Davis. It was the timeline that showed that Steele Davis was the only person who had access to the nominee's personal identifying information at the time when those nominees were claimed in GIRAP by his co-conspirators. It was Steele Davis' banking records, records from his debit card that showed that he was using his card consistently throughout the month, even at times when he was overdrawn. But then around the time when Docupax sent that wire, that $1,000 payment to his co-conspirators and he got that $500 kickback, he stopped using his card for days and weeks at a time. This is not a case where even if there had been erroneously admitted evidence, which there was not, that it would have changed the outcome at all. These are small, discrete areas. And the court didn't focus in its questioning on the small lines of cross-examination regarding Davis' untruthfulness to a CHP officer, but I'll just briefly address that, that the defendant has the wrong rule here. It's analyzed under 609, but it's properly analyzed under 608, dealing with prior acts of untruthfulness, not prior convictions. The jury never heard about the conviction for reckless driving and it wasn't about that. A conviction for reckless driving would not have been admissible. The line of questioning was, weren't you truthful to a CHP officer? Davis said no, and the prosecutor... That one struck me as too clever by half. I wish you hadn't done that. The prosecutor... It's not a question. Understood. I will note that the prosecutor was restrained in his cross-examination. It lasted three questions and lasted less than two pages. So in the scheme of things, no actual evidence came in regarding the convictions or should not be analyzed under 609 at all, and the district court was within its discretion to allow that limited questioning as a specific act of untruthfulness under Rule 608. If the court has no further questions, please sit down. Thank you. We ask that the court affirm the convictions. I really do need to hit this testimony from Mr. Gregory where he said that my client, Davis, offered to slip him a nominee. For one thing, it is another act because it's not part of the fraud scheme alleged. The government has a very effective Exhibit 70. It's in their brief that shows the fraud scheme that they charged, and it's not this offer of my client to slip Gregory a nominee, and the government has argued today that that shows he participates in fraud. That was their argument, and she's exactly right. That shows he's a fraudster. That shows his character. That's the danger. This is a very slippery slope, and words matter, and it shows that that's the kind of person he is, if it's true, because it shows he has knowledge of how it works. I give you a kickback. You get a guy. Knowledge would be under 404B2, which they specifically said we're not going to do. It shows that it's part of his common-planner scheme. That's the way he operates, common-planner scheme, but the government said that's not what we're going to do, and I think I've convinced the court we can't go back and make it that way, and with that, I'm ready to submit. All right. Thank you, counsel. U.S. v. Davis is submitted, and we'll take up United States v. United States ex-rel of one thrower.
judges: Wardlaw, W. Fletcher, Linn